**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **TONY JAZAYERI,** | Case No. 2:19-cv-06003-JDW |
| *Plaintiff* | |
| v. | |
| **AVAYA, INC., et al.,** | |
| *Defendants.* | |

## <u>MEMORANDUM</u>

Tony Jazayeri makes serious charges in this case. He accuses his former employer Avaya, Inc., and his supervisors Steve Deno and Nikhil Deshpande of discrimination and retaliation that resulted in his termination. He also accuses them (and their attorneys) of spoliating evidence. One might expect him to support serious charges like that with serious evidence. One would be wrong.

To prove national origin discrimination, Mr. Jazayeri claims that Avaya has not produced in discovery an annual review for 2018 in which Mr. Deshpande said that Mr. Jazayeri "could not put an English sentence together." But Mr. Jazayeri has not proved that Avaya concealed any documents from him or destroyed any evidence. Even if he did, the document he claims exists would establish only that his superiors criticized his written work product, not that they discriminated against his national origin. To prove retaliation, Mr. Jazayeri claims that an email in which he refused to work nights and weekends constitutes protected conduct. It does not. He offers no evidence at all to prove that his age played a factor in his termination.

Finally, and most appallingly, Mr. Jazayeri tries to prove that Mr. Deshpande discriminated against him on the basis of his national origin and religion based on nothing more than the fact that Mr. Desphpande is Indian and Hindu and therefore presumptively dislikes Muslims because there is strife between Hindus and Muslims in India. The Court rejects Mr. Jazayeri's reprehensible attempt to stereotype Mr. Deshpande, especially in a case where Mr. Jazayeri complains that someone treated him badly based on his membership in a protected class. Because Mr. Jazayeri cannot prove a *prima facie* case for any of his claims, the Court will grant Defendants' summary judgment motion.

## I. BACKGROUND

### A. Mr. Jazayeri's Background

Mr. Jazayeri was born in Iran and left at the age of 19 to attend Hofstra University in New York. He maintains dual citizenship with Iran and the United States. He is also a Muslim and is 62 years old.

Avaya hired Mr. Jazayeri in August 2010. From 2015 until 2018, Mr. Jazayeri reported to Lance Duell. In July 2018, Avaya transferred him to a team that Mr. Deno managed. He had been working with Mr. Deno in other capacities for months before his official transfer. Both Mr. Duell and Mr. Deno reported to Mr. Deshpande, who in turn reported to Glenn Jenkins.

Mr. Jazayeri's supervisors had differing levels of knowledge about his national origin, religion, and age. Mr. Duell assumed Mr. Jazayeri was Muslim because of his accent and his perception of Mr. Jazayeri's Middle Eastern heritage. In 2014, Mr.

Jazayeri attended an Avaya meeting, during which an unidentified Avaya employee saw Mr. Jazayeri ordering a beer. The employee approached Mr. Jazayeri and asked, "aren't you Muslim? The Muslims don't drink, don't they [sic]?" Mr. Jazayeri responded, "that is correct." (ECF No. 41-20 at 265.) Other unnamed Avaya employees were in the area and could overhear this exchange. But Mr. Jazayeri never told Mr. Jenkins, Mr. Deno, or Mr. Deshpande that he is Muslim, and there is no evidence that any of them knew his religion.

As for his nationality, Mr. Jazayeri told Mr. Deno he was from Iran in 2017. The next year he informed Mr. Deno he needed to travel to Iran to visit his sick mother, who still lived there. A year later, he told Mr. Deno and Kay Scheil, Avaya's Managing Director, that his mother had passed away in Iran. At some unidentified time after 2015, during a conference call, an unidentified Avaya employee referred to Mr. Jazayeri as "Al Jazeera." (*Id.* ¶ 38.) Mr. Duell, Mr. Deno, and Mr. Deshpande were all on the call, but did not correct or rebuke the unidentified employee for the comment.

It does not appear that Mr. Jazayeri ever told his managers how old he was, but some unidentified employees referred to him as "old fart." Until the filing of his claim with the EEOC after his termination, Mr. Jazayeri never reported, either formally or informally, to anyone at Avaya that he was being treated differently based on his national origin, religion, or age.

### B.    Mr. Jazayeri's Performance At Avaya

Mr. Jazayeri received mixed performance reviews during his tenure at Avaya. He received low ratings in 2010 and mid-year 2013. His other performance reviews prior to 2017 were generally favorable, though they recommended improvement in particular areas. However, in 2015, an Avaya client asked that he be removed from its team. That request precipitated his transfer to Mr. Duell's team. On January 31, 2017, Mr. Deshpande asked Mr. Deno and Mr. Duell whether they could "use [Mr. Jazayeri] effectively or not moving forward." (ECF No. 41, ¶ 66.) On October 12, 2017, Mr. Deshpande emailed Mr. Deno asking whether he "should . . . trigger [Mr. Jazayeri's] exit more proactively." (*Id.*) Mr. Jazayeri's supervisors did not take any other actions related to Mr. Jazayeri's termination during 2017.

In 2018, Avaya assigned Mr. Jazayeri to work on a project for Carolina East Medical Center. His work on that project generated several negative comments from his supervisors and the client. In fact, Mr. Jazayeri provided the client with a draft that the client noted was incomplete, had the incorrect customer name, inconsistent formatting, spelling errors, and an overall lack of cohesion. The client emailed Mr. Deshpande to complain about the quality of the report. Mr. Deshpande then reached out to Mr. Jazayeri to say the report was "stunning and shocking" (ECF No. 34-2, ¶ 28), and that he expected Mr. Jazayeri to work "on this over the weekends/evenings from now onwards until the situation is de-escalated completely and the project is successfully completed!" (ECF No. 41, ¶ 80.) Mr. Jazayeri responded that, "The work will be done during Avaya working hours. If that is an issue for you, please send me

a dismissal letter today and I'm more than happy to leave Avaya." (ECF No. 34-2, ¶ 29.)

Mr. Deshpande then discussed the situation in an instant messenger chat with Mr. Deno. Mr. Deshpande expressed his frustration with Mr. Jazayeri, noting his "work is shocking to say the least!!" Mr. Deno agreed, replying "it is crap, and that is putting it nicely. . . . [H]is effort was totally bad." Mr. Deshpande said, "I am ready to fire [Mr. Jazayeri] on the spot but that won't solve the problem at hand." He continued, "Guy can't even write one line of English??? I beat [Mr. Jazayeri] hard. This is the moment for him to work 24 hours a day if that is what it takes. No mercy." (ECF No. 41, ¶ 81.)

In his 2018 evaluation, Mr. Jazayeri received a "Low Relative Contributor" evaluation. The evaluation explained that "[f]eedback from account team on deliverables documentation was not positive. Project work did not meet team standards, not only from a content, but basic written skills, myself and others had to assist." (*Id.* ¶ 86.) Mr. Deno prepared that evaluation. To do so, he considered several projects with which Mr. Jazayeri was involved, and he spoke with Mr. Duell. Mr. Deno promised to help Mr. Jazayeri improve after his 2018 LRC evaluation, but he did not place Mr. Jazayeri on a Performance Improvement Plan or otherwise provide him with coaching.

### C. Avaya's Headcount Reduction

In February 2019, Mr. Jenkins initiated a headcount reduction across Avaya. He identified approximately 120 positions for possible elimination. He asked his

subordinates, including Mr. Deshpande and Mr. Deno, to make recommendations of people and positions that they thought could be eliminated. Mr. Deshpande and Mr. Deno determined that Mr. Jazayeri's position could be eliminated based on his 2018 LRC review, and so "his position could be eliminated without causing a disruption to the team," and would have "the least impact." (ECF No. 34-2, ¶¶ 73-74.) Of the 120 positions proposed for elimination, Mr. Jenkins selected two positions for elimination, including Mr. Jazayeri's position.

When Avaya notified Mr. Jazayeri it was terminating him, it provided him information showing that over 100 individuals considered for elimination and ultimately retained were older than Mr. Jazayeri. Avaya contends it eliminated Mr. Jazayeri's position completely and did not hire anyone to fill that position, but Mr. Jazayeri counters that within days of Plaintiff's termination, Avaya was advertising for a position that had similar responsibilities. However, there is no evidence before the Court that Avaya hired anyone to replace Mr. Jazayeri.

### D. Procedural History

Mr. Jazayeri filed a Charge of Discrimination with the EEOC in April 2019. He claimed that, among other things, his year-end 2018 performance review included language that he "could not put an English sentence together." (*Id.* ¶ 2.) On September 23, 2019, an EEOC investigator told Avaya that Avaya either had to provide Mr. Jazayeri's personnel file and performance reviews or engage in settlement discussions. The EEOC investigator set a deadline of September 30 for Avaya to provide the relevant documents.

On September 25, 2019, rather than wait to see if Avaya would provide the requested documents, Mr. Jazayeri requested a Notice of Right to Sue letter from the EEOC. Two days later, Avaya asked for more time to produce the documents, but the EEOC disclaimed further jurisdiction because it had issued the Right to Sue letter.

Mr. Jazayeri filed this action on December 19, 2019. The Court conducted an initial Case Management Conference on May 5, 2020 and entered a scheduling order requiring the parties to complete discovery by October 30, 2020. On October 22, 2020, the Court amended the schedule so that the parties were to complete discovery on January 29, 2021. On December 23, 2020, the Court amended the schedule a second time so that the parties were to complete discovery on March 1, 2021.

Throughout discovery, Mr. Jazayeri and his counsel have accused Avaya and its counsel of discovery misconduct, mostly relating to the production of Mr. Jazayeri's 2018 year-end review. Mr. Jazayeri filed a motion to compel on February 22, 2021. The Court conducted a telephone conference about that motion on February 24, 2021. During that call, Mr. Jazayeri's counsel stated that Mr. Jazayeri did not want to extend discovery but wanted to get issues resolved in the case. In addition, Mr. Jazayeri withdrew his motion with respect to requests for production and demands that Avaya identify certain documents. The Court issued an order that required Avaya to produce updated metadata and any revisions to Mr. Jazayeri's 2018 year-end review, and Avaya reported to the Court that it complied with that requirement.

On March 4, 2021, Mr. Jazayeri's counsel informed the Court by email that Mr. Jazayeri intended (a) to raise with the Court several issues about Avaya's production

of metadata and year-end reviews and (b) seek reconsideration and/or clarification of the Court's order. The Court explained in response that it did not intend to adjust any case management deadlines.

On March 12, Defendants filed this summary judgment motion. On March 26, 2021, Mr. Jazayeri's counsel sent the Court a letter asking the Court to hold summary judgment briefing in abeyance pending a forthcoming sanctions motion. In response, the Court told the parties that it would not hold briefing in abeyance but would address how to remedy any discovery failures after resolving the forthcoming sanctions motion. Mr. Jazayeri never filed a sanctions motion. Instead, he filed a summary judgment opposition on April 20, 2021. Accompanying that opposition, Mr. Jazayeri submitted a Counterstatement of Material Facts. The first 24 paragraphs of that Counterstatement purport to detail Avaya's discovery misconduct, mostly surrounding the production or lack thereof, of Mr. Jazayeri's 2018 year-end performance review.

## II.  LEGAL STANDARD

### A.  Summary Judgment

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential

to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted). In considering a motion for summary judgment, a district court may not make credibility determinations. *See Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004). If a "moving party has demonstrated the absence of a genuine issue of material fact—meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole—concerns regarding the credibility of witnesses cannot defeat summary judgment." *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998).

## B.  *McDonnell-Douglas*

The Court analyzes all of Mr. Jazayeri's claims under the familiar three-step *McDonnell-Douglas* framework. *See Glanzman v. Metro. Mgt. Corp.*, 391 F.3d 506, 509 n.2 (3d Cir. 2004) (claims under Title VII, PHRA, and ADEA all utilize the *McDonnell-Douglas* framework). First, an employee must establish a *prima facie* case of discrimination. *See Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 n. 11 (3d Cir. 2004). If the employee makes out a *prima facie* case of discrimination, the

employer then has a burden of production (but not persuasion) to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. *See id.* If the employer articulates a legitimate reason, the employee must then proffer evidence to allow a reasonable factfinder to find by a preponderance of the evidence that the employer's proffered reasons are false or pretextual. *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (*per curiam*).

As part of this analysis, a plaintiff must show that his supervisor had knowledge of the plaintiff's status in a protected class. *Geraci v. Moody-Tottrup Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996) ("it is counter-intuitive to infer that the employer discriminated on the basis of a condition of which it was wholly ignorant . . . ."); *see also Cange v. Phila. Parking Auth.*, 2010 WL 1254337, at *2 (E.D. Pa. Apr. 1, 2010). Alternatively, under what is known as a cat's paw theory of liability, a plaintiff seeks to hold his employer liable for the animus of a subordinate, non-decisionmaker where the actual decisionmaker was unaware of plaintiff's status in a protected class, but was influenced by the subordinate. *See McKenna v. City of Philadelphia*, 649 F.3d 171, 177-78 (3d Cir. 2011). To prove a cat's paw theory, a plaintiff must show that the conduct was a proximate cause of the termination, meaning "some direct relation between the injury asserted and the injurious conduct alleged," as opposed to links that are "remote, purely contingent, or indirect." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 330-31 (3d Cir. 2015).

## III.   ANALYSIS

Mr. Jazayeri's opposition is really two submissions in one. Although most of his opposition brief focuses on the merits of the summary judgment motion, he devotes dozens of paragraphs in his Counterstatement of Facts to assertions about Avaya's compliance with its discovery obligations. The Court therefore addresses those discovery issues first, before turning to the merits of the dispute.

### A.   Discovery Disputes

Mr. Jazayeri claims that Avaya did not comply with its discovery obligations. Most notably, although Mr. Deno and Mr. Deshpande are named as individual defendants, their counsel did not obtain and search their personal devices until close to the end of discovery, when the Court required that search to occur. In addition, there seem to have been some initial problems locating and producing the final version of Mr. Jazayeri's 2018 year-end evaluation. None of these discovery concerns delays or alters the outcome of the summary judgment motion, though.

First, as a procedural matter, the Court does not have a basis to sanction Avaya or to draw a negative inference based on Avaya's discovery conduct. Courts act pursuant to motions, and parties must file motions pursuant to Federal Rule of Civil Procedure 7 if they seek relief. Mr. Jazayeri has not put a motion before the Court. He has not even asked for relief concerning the supposed discovery misconduct. He has just spelled out the factual predicate for it in his Counterstatement of Facts. If Mr. Jazayeri believed that Avaya did not comply with its discovery obligations, then he should have filed a motion to compel or a separate motion for sanctions, as he

suggested he intended to do. Then, if the Court concluded that Avaya owed him more in discovery, it could have issued an order compelling the production of that information.

To the extent that Mr. Jazayeri interpreted the Court's instruction in March 2021 about finishing summary judgment briefing to mean that a summary judgment opposition was the way to raise his discovery concerns, his interpretation of the Court's instruction is unreasonable. In response to a claim about a forthcoming discovery motion, the Court said that it would not delay summary judgment briefing but would decide how best to address any problems after addressing the forthcoming motion. But the motion never came, so the Court had no occasion to act.

Second, the Court cannot draw a negative inference based on the delay in searching the personal devices of Messrs. Deno and Deshpande. To draw a negative inference, the Court would have to conclude both that the Defendants destroyed evidence in a way that reflects consciousness of guilt and that the destruction prejudiced Mr. Jazayeri. Mr. Jazayeri has not made either showing. While best practices dictated that Defendants' counsel retrieve and search Mr. Deno's and Mr. Deshpande's personal devices, the Court has no basis to conclude that the failure to do so was anything other than an oversight. In fact, Mr. Jazayeri's counsel did not even raise it with the Court until the eve of the close of discovery, after months of discovery. That delay in raising the issue suggests it was not top-of-mind for anyone. In addition, Mr. Jazayeri has not demonstrated that any relevant data was lost or that he suffered any prejudice.

Ultimately, for all of his bluster about discovery violations, none of the allegations matter unless Mr. Jazayeri can identify some discoverable material that he did not receive in discovery and to which he was entitled. The only document that arguably falls in that category is a version of the 2018 year-end review that contains language to the effect that Mr. Jazayeri "could not put an English sentence together." (ECF No. 41, ¶ 2.) Mr. Jazayeri's efforts to prove that such a document exists fall short. He speculates about material that Avaya elected to hold back as privileged, and he claims that witness testimony supports his position. The Court disagrees, but it doesn't matter. For present purposes, the Court will assume that, at trial, Mr. Jazayeri would put before the jury a version of the 2018 year-end review that contains that language. Even if he did, he could not survive summary judgment.

## B. Merits

### 1. Use of stereotypes

Mr. Jazayeri asks the Court to draw conclusions about Mr. Deshpande's knowledge and motive based on Mr. Deshpande's Indian heritage, his Hindu religion, and his time living in, and family connections to, India. He argues that Mr. Deshpande must have had a discriminatory motive given the "deep-seated and enduring tensions and unrest between the Hindu and Muslim communities in India." (ECF No. 41, ¶ 58.) The Court condemns Mr. Jazeyeri's argument in the strongest possible terms. It has no place in the judicial system, and his counsel should know better than to make it.

Mr. Jazayeri's argument violates one of the most fundamental principles of the judicial system. Justice should be blind. Courts do not draw conclusions about anyone—not lawyers, not parties, and not witnesses—based on their membership in a protected class. Instead, courts make determination about the people who appear before them based on the evidence they muster and the way that they behave. That is, they make judgments about people as individuals, not as members of a group. This should be true in every case, and it should be apparent to every lawyer that appears before the Court. But it should be especially true in a case like this, when Mr. Jazayeri himself claims to be the victim of invidious discrimination. He cannot prove discrimination by engaging in stereotyping of his own.

The Court has said before that it does not want to see counsel advance these types of arguments. *See Laveglia v. TD Bank, N.A.*, 2020 WL 2512802, at *3 (E.D. Pa. May 15, 2020). This situation is even worse than the situation in *Laveglia*. There, the defendant asked the Court to draw a "positive" inference that two members of the same protected class would not discriminate against each other. Mr. Jazeyeri asks the Court to draw a "negative" inference: that someone was predisposed to discriminate against him based on his membership in a protected class. As the Supreme Court has said, the "way to stop discrimination . . . is to stop discriminating . . . ." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007). It is not to employ discriminatory presumptions. Parties are entitled to vigorously pursue their legitimate claims in court. But they should not resort to discriminatory, stereotypical presumptions to do so. The Court therefore takes this

opportunity to reiterate what it said in *Laveglia*: arguments suggesting that people act in a certain way based on their membership in a protected class are not welcome in the judicial system. Attorneys should not make them, and the Court will not consider them.

### 2. Decisionmakers

Mr. Jenkins decided to terminate Mr. Jazayeri only after Mr. Deno and Mr. Deshpande recommended his termination. Mr. Jenkins had no input into the initial decision about who to terminate and only considered candidates that people within the company suggested to him. Under the circumstances, Mr. Jazayeri has developed facts that, considered in the light most favorable to him, make out a cat's paw theory. The Court will therefore consider Mr. Deno's and Mr. Deshpande's motives in recommending Mr. Jazayeri's termination, as well as Mr. Jenkins' motive in deciding to terminate Mr. Jazayeri.

### 3. Other discrimination cases against Avaya

In his sur-reply, Mr. Jazayeri argues for the first time that the Court should conclude that Avaya had a discriminatory animus because a jury concluded in 2011 that Avaya discriminated against a former employee based on age in 2002. *See Saffos v. Avaya Inc.*, 419 N.J. Super. 244 (2011). There are two problems with this argument. First, Mr. Jazayeri raises it for the first time in his sur-reply. He could have raised the argument in his Opposition. The Court will not consider a new argument that a party makes for the first time in a sur-reply. *See Kantz v. AT&T, Inc.*, Civ. A. No. 20-531, 2021 WL 1061190, at * 8 (E.D. Pa. Mar. 19, 2021). Second, even if the Court

considered the argument, the fact that a jury concluded that Avaya (and its predecessor) engaged in discriminatory conduct in 2002 has no relevance to whether Avaya discriminated against Mr. Jazayeri when it terminated him 17 years later, in 2019.

4. ***Prima facie* case**

a. **National origin**

To make out a *prima facie* case for national origin discrimination under Title VII and the PHRA Mr. Jazayeri must show that he: (1) is a member of a protected class; (2) was qualified for the position he sought to attain or retain; (3) suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination based on his national origin. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). The Parties dispute whether Mr. Jazayeri has evidence to support the fourth element.

There is no evidence before the Court that Mr. Jenkins knew Mr. Jazayeri's national origin. But Mr. Jenkins decided to terminate Mr. Jazayeri at Mr. Deno's and Mr. Deshpande's instance, so their knowledge matters too. Without Mr. Jazayeri's inappropriate stereotypes, there is no evidence that Mr. Deshpande knew Mr. Jazayeri's national origin. There is, however, evidence that Mr. Deno knew of Mr. Jazayeri's national origin because he was aware that Mr. Jazayeri returned to Iran for his mother's funeral.

Mr. Jazayeri relies on Mr. Deshpande's statement to Mr. Deno that Mr. Jazayeri "can't even write one line of English" to prove national origin discrimination,

as well as the similar statement in the missing year-end 2018 performance review. It is true, of course, that Mr. Jazayeri was not born in the United States and that English is a second language for him. But Mr. Deshpande's statement is not, on its face, tied to Mr. Jazayeri's Iranian heritage; it is focused on problems that Mr. Deshpande saw in Mr. Jazayeri's written work product. Where poor English language skills affect job performance, no reasonable factfinder can conclude that comments about those language skills are discriminatory. *See Abbasi v. SmithKline Beecham Corp.*, No. 08-cv-277, 2010 WL 1246316, * 8 (E.D. Pa. Mar. 25, 2010). Although Mr. Jazayeri disagrees with Mr. Deshpande's assessment of the errors, that is beside the point. The law allows Mr. Deshpande to be as critical or uncritical as he wants, as long as he does not discriminate. *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) ("The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]."). Mr. Deshpande could have leveled the same criticism at someone born in the United States who offered poor written work. Because the statement is not facially one that ties to Mr. Jazayeri's national origin, Mr. Jazayeri would need some evidence that tends to show that Mr. Deshpande was using the reference to writing English as a proxy for Mr. Jazayeri's national origin. He has none.

Because Mr. Deshpande's statement about Mr. Jazayeri's butchery of the English language does not evidence national origin discrimination, Mr. Jazayeri's discovery-related complaints become irrelevant. Even if Mr. Jazayeri had a copy of a year-end review in which Mr. Deshpande criticized Mr. Jazayeri's language skills,

that document would not demonstrate national origin discrimination. At most, it would demonstrate that Mr. Deshpande was a demanding boss, which is not illegal.

The other evidence also does not create an inference of discrimination. It would reveal only that Mr. Jazayeri's superiors were unimpressed with his work product and work ethic. On January 31, 2017, Mr. Deshpande asked Mr. Deno and Mr. Duell whether they could make use of Mr. Jazayeri. Then, on October 12, 2017, Mr. Deshpande asked Mr. Deno whether he should try to precipitate Mr. Jazayeri's exit from Avaya. Mr. Jazayeri also points to the fact that he was officially transferred six weeks before his 2018 review, to other work he believes he did a good job on was not reflected in his review, and to the fact that Mr. Deno said he would help him improve, but he never did. Mr. Jazayeri can disagree with those decisions, but the Court is not a "super-HR" department. It can only assess claims for discrimination under applicable anti-discrimination law.

### b. Religion

To make out a *prima facie* case for religious discrimination under Title VII and the PHRA Mr. Jazayeri must show that he: (1) is a member of a protected class; (2) was qualified for the position he sought to attain or retain; (3) suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination based on his religion. *Makky*, 541 F.3d at 214. Mr. Jenkins, Mr. Deno, and Mr. Deshpande all maintain they were unaware that Mr. Jazayeri was Muslim. Although Mr. Jazayeri tries to rebut that evidence, nothing he offers creates a disputed issue of fact.

Mr. Jazayeri has not offered any evidence that bears on Mr. Jenkins' knowledge, so he has to demonstrate that either Mr. Deno or Mr. Deshpande knew he was Muslim. He attempts to do so by arguing that his religion was generally known at Avaya. He bases that argument partly on stereotypes: because he has a surname that indicates Middle Eastern heritage, he must be Muslim. But that's not necessarily true, and he cannot rely on a stereotype to satisfy his burden. He also points to the meeting in 2014 when an unidentified Avaya employees asked if he was Muslim. But that employee was not one of the decisionmakers now at issue, and there is no evidence that Mr. Deno or Mr. Deshpande overheard that comment. Mr. Jazayeri also points to the occasion that someone called him "Al Jazeera." It appears that Mr. Deno and Mr. Deshpande were on the phone when that happened, but that single, stray statement by an unknown third party does not mean that Mr. Deno or Mr. Deshpande knew Mr. Jazayeri's religion, let alone that they had a discriminatory animus.

Even if Mr. Jazayeri had some evidence that Mr. Deno or Mr. Deshpande knew his religion, he still would not demonstrate a *prima facie* case because he has no evidence that his religion played any role in his termination. The fact that Mr. Deno and Mr. Deshpande stayed silent after hearing someone refer to Mr. Jazayeri as "Al Jazeera" does not, on its own, demonstrate religious animus or otherwise suggest that they had his religion in mind when they recommended his termination. *See Gomez v. Allegheny Health Svcs., Inc.*, 71 F.3d 1079, 1085 (3d Cir. 1995) (stray remark by non-decision maker does not demonstrate discriminatory animus). The only other

evidence that Mr. Jazayeri identifies to support his claim is Mr. Deshpande's background, and the Court will not stereotype Mr. Deshpande to assume religious animus.

### c.    Age

To make out a *prima facie* case for age discrimination under the ADEA and the PHRA, Mr. Jazayeri must show: (1) he is at least forty years old; (2) he suffered an adverse employment decision; (3) he was qualified for the position in question; and (4) he was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (citing *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013)). Put differently, to succeed on an ADEA claim, Mr. Jazayeri must establish, by a preponderance of the evidence, that age was the "but-for" cause of the adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009).

Mr. Jazayeri has not produced evidence that, taken as true, would support an inference that his age was the cause of his termination. He has no evidence that any decision-maker knew his age. He claims that "[a]ll of the decision makers knew that Plaintiff was over 40 and likely significantly over 40" (ECF No. 41, ¶ 41), but he only cites evidence that Mr. Durell knew his age. While he does state that some unidentified employee called him an "old fart," there is no evidence that employee was one of Mr. Jazayeri's supervisors or a decisionmaker. *See Gomez*, 71 F.3d at 1085. The fact that Mr. Durell knew Mr. Jazayeri's age does not mean any other

decisionmaker had similar knowledge, and they have denied knowing his age. Mr. Jazayeri claims that Mr. Deno's and Mr. Deshpande's testimony that they did not know Mr. Jazayeri's age is not credible, but generalized claims about credibility do not create factual disputes for trial. *See Schoonejongen*, 143 F.3d at 130. (ECF No. 34-2, ¶ 47.)

Even if Mr. Jazayeri could show that a decisionmaker knew his age, he still has not raised a factual dispute about whether that information factored into his termination. As he acknowledges, Avaya retained many employees older than him when it terminated him. He also has not shown that anyone replaced him, let alone that someone younger did so. The only evidence that Mr. Jazayeri offers is a job posting from Avaya offering a position with a similar title and job description, but he has no evidence that Avaya hired anyone for that position. In short, even if the Court assumes Mr. Jenkins and the non-decision-making supervisors knew Mr. Jazayeri's age, there is no evidence that age played a role in his termination.

### d.   Retaliation

In order to make out a *prima facie* case for retaliation, Mr. Jazayeri must show: (1) he engaged in protected activity; (2) he suffered adverse action by the employer; and (3) there is a causal connection between the employee's activity and the employer's adverse action. *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002). Protected activity "can include informal protests of discriminatory employment practices such as making complaints to management." *Moore v. Sec. U.S. Dept. of Homeland Sec.*, 718 F. App'x 164, 166 (3d Cir. 2017). For Mr. Jazayeri's

complaints to qualify as a protected activity, he must have held an objectively reasonable, good faith belief that his employer's activity was unlawful under the Title VII, the PHRA, or the ADEA. *See Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006).

Mr. Jazayeri did not engage in protected activity. The only conduct that he identifies is the email that Mr. Jazayeri sent to Mr. Deshpande, with a copy to Mr. Jenkins, disputing his obligation to work on nights and weekends. Nothing in that email complains about discriminatory conduct or suggests that Mr. Deshpande required Mr. Jazayeri to work those hours based on membership in any protected class. Instead, the email reflects a run-of-the-mill dispute about work hours. Because the email does not relate to discrimination, Mr. Jazayeri has not established a prima facie case of retaliation.

### 5. Legitimate nondiscriminatory reason

Avaya claims that it terminated Mr. Jazayeri as part of a regular review for redundancies in the wake of its 2017 bankruptcy and found Mr. Jazayeri's position "could be eliminated without causing a disruption to the team," because he had received multiple poor performance reviews. (ECF No. 34-1 at 21-22.) That qualifies as a legitimate, non-discriminatory reason to terminate Mr. Jazayeri.

### 6. Pretext

To show pretext, Mr. Jazayeri must offer evidence from which a factfinder could reasonably either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a

motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). To satisfy the first prong, the "the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999). The Third Circuit has commented that pretext is difficult to establish. *See Fuentes.* 32 F.3d at 765.

Mr. Jazayeri has no evidence from which a factfinder might conclude that invidious discrimination was the real reason behind his termination. He points to three facts to claim that a factfinder might disbelieve Avaya's explanation, but they do not create a factual dispute about pretext: (a) production issues with the 2018 year-end review; (b) Mr. Deno's failure to put him on a performance improvement plan or otherwise help him improve; and (c) the fact that Avaya's headcount reduction plan only resulted in two people being fired.

First, even if there was a final version of the 2018 year-end review that contained a statement about Mr. Jazayeri's English-language skills, it would not give a factfinder a basis to disbelieve Avaya. A discovery dispute about that irrelevant document also does not give a reason to disbelieve the factfinder. Second, although a different manager might have addressed Mr. Jazayerli's performance failures, that difference does not establish pretext. *See Fuentes*, 32 F.3d at 765 (it is not enough to show that an employer's decision was "wrong or mistaken," as the issue is "whether discriminatory animus motivated the employer, not whether the employer is wise,

shrewd, prudent, or competent"). Third, and finally, it is somewhat odd that Avaya only eliminated 2 of the 120 identified positions planned in its headcount reduction, though it appears from Mr. Jenkins' testimony that he may have taken other steps to achieve financial savings similar to the headcount reduction (by, for example, reducing the use of contractors). In any event, to view that oddity as a basis to disbelieve Avaya's reason for termination, a factfinder would have to conclude that fact indicates that Avaya initiated a company-wide evaluation process and fired another individual as part of an elaborate ruse to terminate Mr. Jazayeri for discriminatory reasons. No reasonable factfinder could do so.

### 7. Individual liability under PHRA

To find individual liability under the PHRA, a plaintiff must show that a "supervisory employee . . . 'knew or should have known that the [p]laintiff was being subjected to harassment' but '**<u>repeatedly refused</u>** to take action to end the harassment directed at [the plaintiff].'" *Rosh v. Gold Standard Café at Penn, Inc.*, 2016 WL 7390125, at *7 (E.D. Pa. Dec. 19, 2016) (emphasis added) (quoting *Dici v. Com. of Pa.*, 91 F.3d 542, 553 (3d Cir. 1996)). Where an employee has not been subjected to discrimination, his individual liability claim must fail. *See Jeannot*, 356 F. Supp. 3d at 449 (because the court "had dismissed all primary violations of the PHRA or federal law counterpart, . . . therefore, the [individual liability] claim could not stand alone"); *Eldeeb v. AlliedBarton Sec. Servs., LLC*, 2008 WL 4083540, at *11-12 (E.D. Pa. Aug. 28, 2008) (there can be no Section 955(e) liability where there is no Section 955(a) liability).

Because Mr. Jazayeri has not established a *prima face* case of discrimination, his individual liability claims under the PHRA also fail. In addition, Mr. Jazayeri only identifies one specific instance that could qualify as harassment; the phone call where an unidentified attendee referred to Mr. Jazayeri as "Al Jazeera." That single stray comment does not establish the repeated harassment necessary for individual PHRA liability.

## IV. CONCLUSION

To survive summary judgment, Mr. Jazayeri had to provide evidence that suggested he was fired because of his national origin, his religion, or his age, or in retaliation for protected conduct. He has not, and neither discovery disputes nor a call for the Court to stereotype Mr. Deshpande can overcome that failure. The Court will grant Avaya's Motion for Summary Judgment. An appropriate Order follows.

**BY THE COURT**:

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

May 28, 2021